UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/1/2023
```

BANOKA S.à.r.l, et al,

                      Petitioners,

-against-

Alvarez & Marshal, Inc. et al,

                      Respondents.

**OPINION**

22-MC-00182 (GHW)(KHP)

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE:**

      Petitioners BANOKA S.à.r.l., ATYS S.A., Renato Picciotto, Jacques Champy, and Jean Bissonnet bring this action pursuant to 28 U.S.C. § 1782 seeking permission to issue subpoenas on Alvarez & Marsal, Inc. ("A&M Inc."), Alvarez & Marsal Transaction Advisory Group, LLC ("A&M Transaction Advisory Group"), and Alvarez & Marsal Holdings, LLC ("A&M Holdings") (collectively the A&M Respondents"), as well as Elliott Management Corporation ("Elliott Management"), Elliott Investment Management, L.P. ("Elliott Investment Management"), Elliott Associates, L.P. ("Elliott Associates"), and Elliott International, L.P. ("Elliott International") (collectively the "Elliott Respondents").  Petitioners seek documents and deposition testimony for use in a contemplated suit against another entity, Westmont International Development Inc. ("Westmont") to be commenced in the English High Court of Justice (the "UK Action").

BACKGROUND

      Petitioners contend that Westmont committed fraud in connection with negotiations over a potential acquisition of Petitioners' shares in Clichy Victor Hugo ("CVH"), a French company that operated a Holiday Inn branded hotel in Paris, France (the "Hotel").  (Pet'r's Br. 1.)  In October 2019, Petitioners granted Westmont exclusive negotiating rights to acquire their

1

shares in CVH based on Westmont's alleged representation in an October 16, 2019 non-binding Offer Letter that it would pay Petitioners €55 million for the shares.[1] (*Id.*; ECF No. 16, Didelot Declaration ("Didelot Decl."), Exh. 2.) Respondents Elliott Associates and Elliott International are two funds with a long-standing relationship with Westmont that planned to provide some or all of the financing for purchase of the Hotel through WNE Investor Sarl, an entity in which they are substantial majority owners. (ECF No. 35-14, Stott Declaration ("Stott Decl.") ¶¶ 7, 9.) The Elliott Respondents' London-based affiliate, Elliott Advisors (UK) Limited ("Elliott UK"), liaised with Westmont on the progress of the negotiations but did not directly participate. (Stott Decl. ¶¶ 9-10.)

The exclusive negotiating period was October 17-December 31, 2019, during which time Westmont was to complete due diligence and negotiate and finalize the share purchase agreement ("SPA"). (Pet'r's Br. 4-5.)

Petitioners contend that Westmont never intended to purchase the shares for €55, but rather sought to cause Petitioners to stop negotiating with other potential buyers who had made bids and then manufacture issues in due diligence to delay the acquisition and extract price concessions. (*Id.* at 5-6.)

Petitioners appointed Cofis S.A. ("Cofis") to manage and negotiate the proposed share purchase transaction with Westmont. (*Id.* at 4.) Christie & Co. ("Christie") served as the broker for the transaction. (*Id.*) Gordon Drake, a Senior Vice President, lead the negotiations on behalf of Westmont. (*Id.*) Alvarez & Marsal France SAS ("A&M France") conducted due

---

[1] The parties agreed in writing that any disputes relating to the offer would be adjudicated in the courts of England and Wales. (Didelot Decl., Exh. 2; ECF No. 15, Levy Declaration ("Levy Decl.") ¶ 20).

diligence on behalf of Westmont pursuant to an engagement letter with an affiliate of Westmont.[2] (ECF No. 31, Martinez Declaration ("Martinez Decl.") ¶ 2, Exh. A.)

On December 9, 2019, Westmont alerted Petitioners to two concerns: (1) that the costs for certain staff members of the Hotel had not been properly accounted for and (2) that the interest rate on a loan related to the transaction was misstated. (Pet'r's Br. 5.) Petitioners characterize the first concern as minor and the second one as unwarranted insofar as the correct rate had been previously provided. Westmont raised other concerns about the fire and safety certification for the Hotel, disability access to the Hotel, and costs for work on the Hotel lobby, which Petitioners contend were not material to the transaction and a pretext for delay and securing price concessions. (*Id.* at 5-6.)

On December 12, 2019, Westmont proposed price adjustments to reflect the concerns it raised while assuring Petitioners it wanted to close the transaction. (*Id.* at 6.) Petitioners agreed to drop the price €1 million and extend the exclusivity period to January 31, 2020. (*Id.* at 7.) The extension of the negotiation period necessarily caused Petitioners to incur additional fees and expenses in operating the Hotel. (*Id.*)

Petitioners contend Westmont further delayed the transaction by failing to promptly provide "know your customer" ("KYC") documents to its financial lender and seeking to delay negotiations with the gas supplier to the Hotel until after the transaction closed. (Didelot Decl. ¶ 21.) This necessitated a further extension of the exclusivity period to February 12, 2020,

---

[2] A&M France's parent company, A&M Europe Holdings Limited, is located in the United Kingdom, which is in turn owned by Alvarez & Marsal Holdings, LLC ("A&M Holdings"). Respondent Alvarez & Marsal Inc., a New York corporation, holds a majority interest in A&M Holdings. Respondent Alvarez & Marsal Transaction Advisory Services, LLC is wholly owned by A&M Holdings. (ECF No. 30, Feigenbaum Declaration ("Feigenbaum Decl.") ¶¶ 3-4.)

3

which Petitioners say they extended in reliance on Westmont's representations that it did indeed intend to complete the acquisition by March 2020.  (*Id.* at ¶ 23.)

As everyone now knows, the Covid-19 virus emerged during the parties' negotiations, and the World Health Organization declared a global pandemic on March 11, 2020.  *CDC Museum COVID-19 Timeline*, CDC, https://www.cdc.gov/museum/timeline/covid19.html (last visited January 30, 2023).  Reports that COVID-19 was a serious concern emerged in January 2020, and the Centers for Disease Control began screening passengers from certain flights for the virus in mid-January 2020.  *Id*.  Petitioners assert that Westmont ceased all communications about the transaction for three weeks starting at the end of January and into February because it was re-evaluating the transaction in light of significant and emerging worldwide concerns about the virus.  (Didelot Decl. ¶ 25.)  They also assert that Westmont had superior knowledge about the virus due to its substantial commercial presence in Asia, where the virus first emerged.  (*Id.*)

On February 13, 2020, Westmont postponed the target date for the anticipated closing because of an outstanding consultant report—something Petitioner characterizes as a pretext for delay.  (*Id.* at ¶ 27.)  Nevertheless, Westmont's representatives still indicated Westmont intended to close by the end of February.  (*Id.* at ¶ 29.)  On February 25, 2020, Westmont sought to introduce an "earn-out structure"—something that had never before been discussed—and renegotiate the purchase price downward in light of the rapidly deteriorating landscape, especially in the hospitality industry, due to COVID-19.  (*Id.* at ¶ 30.)  It also contended that the Elliott Respondents' special investment committee required more time to

approve the transaction.  (Pet'r's Br. 9.)  Petitioners rejected Westmont's attempt to renegotiate, negotiations broke off, and the transaction was never consummated.  (*Id.* at 10.)

Petitioners contend that but for Westmont's fraudulent representations, they would not have agreed to bargain exclusively with Westmont and could have sold their shares in CVH to one of the other bidders, one of whom (Catella Hospitality Group) had bid €53.6 million in late 2019.  (*Id.* at 11.)  However, due to changes in market conditions related to the Covid-19 pandemic, Petitioners were not able to sell their shares until November 2020.  At that time, they sold their shares to Catella Hospitality Group for €48 million, a price that was €7 million less than it had offered a year prior.  (*Id.*)

On April 23, 2020 and June 30, 2020, Petitioners sent pre-litigation letters to Westmont setting out the purported factual and legal basis for fraud claims against Westmont under English law, a required procedure in England.  (*Id.* at 10.)  Petitioners also made a pre-suit demand for documents and communications between and among Westmont, the A&M Respondents and the Elliott Respondents concerning A&M Respondents' due diligence and Elliott Management's role as co-investor in the transaction.  (*Id.*)  Westmont refused to provide documents and information.

In December 2020, Petitioners filed an action pursuant to 28 U.S.C. § 1782 in the Southern District of Texas, where Westmont maintains its global headquarters, seeking much of the same information they had requested directly from Westmont.  (*Id.* at 11.*); see In re Petition of Banoka S.á.r.l, ATYS S.A. et al.*, Case No. 4:20-cv-04131 (S.D. Tex. Dec. 4, 2020) (the "Prior Application", ECF No. 1).  The court in Texas found that the documents sought were "for use" in a foreign proceeding that was reasonably contemplated but ultimately concluded that a

5

forum selection clause in Westmont's Offer Letter to Petitioners to purchase the shares required Petitioners to seek disclosure from Westmont in England in accordance with English pre-suit disclosure procedures and that the application should not be granted, a decision affirmed by the Fifth Circuit. (Pet'r's Br. 13-14.) Thus, the court quashed the subpoena after initially granting the Section 1782 application *ex parte* and without a hearing. The lower court also stated that it would be inappropriate to apply Section 1782 extraterritorially when Westmont's responsive documents, and the custodian of those documents, were located in England. *Banoka v. Westmont Int'l Dev. Inc.*, 2022 WL 480118, at *4 (S.D. Tex. Feb. 10, 2022), *aff'd sub nom. Bissonnet v. Westmont Int'l Dev., Inc.*, 2022 WL 636680, at *1 (5th Cir. Mar. 4, 2022).

## THE INSTANT PETITION

In this action, Petitioners seek information they were not able to obtain directly from Westmont, and they seek much the same information from both sets of Respondents. The list of documents requests in items 1-10 below are propounded on both sets of Respondents. (ECF No. 17, Pencu Declaration ("Pencu Decl."), Exh. 1-8.) Items 11-14 are propounded on the Elliott Respondents only. (Pencu Decl., Exh. 4-8.) The specific requests are set forth below:

1. All documents and communications between Elliott Respondents/A&M Respondents and Westmont concerning CVH.
2. All documents and communications, including pricing calculations, evidencing the basis of Westmont's initial and revised offers to purchase the shares of CVH.
3. All documents and communications concerning any exclusivity agreement between Westmont and the Shareholders in connection with Westmont's plan to purchase the shares of CVH.
4. All documents and communications concerning any extensions of the exclusivity period between Westmont and the Shareholders for the purchase of the shares of CVH.
5. All documents and communications evidencing any due diligence performed in connection with Westmont's plan to purchase of the shares of CVH.

6. All documents and communications between Elliott Respondents/A&M Respondents and Westmont concerning the impact and effect of the COVID-19 pandemic on Westmont's plans to purchase the shares of CVH.
7. All documents and communications between Elliott Respondents/A&M and Westmont concerning the SPA and Westmont's plan to purchase the shares of CVH.
8. All documents and communications between or among Elliott Respondents/A&M Respondents, Westmont and Christie & Co. concerning the SPA and Westmont's plan to purchase the shares of CVH.
9. All communications between Elliott Respondents/A&M Respondents and Kingsley Seeveratnam, Jan-Willem Terlouw, Christopher Rawstron, Gordon Drake, Stephan Jacques or any other senior employees of Westmont concerning Westmont's plan to purchase the shares of CVH.
10. Communications between Elliott Respondents/A&M Respondents and Westmont concerning the impact and effect of the COVID-19 pandemic on Westmont's plan to purchase the shares of CVH.
11. All documents and communications evidencing the basis for postponing signing the SPA on February 13, 2020.
12. All documents and communications concerning the basis for Westmont's requests to reduce the €55 million purchase price of the shares of CVH.
13. All documents and communications evidencing the decision and date upon which Westmont decided to reformulate its share purchase proposal to the Shareholders on or about February 25, 2020.
14. All documents and communications evidencing Westmont's funding, including without limitation any co-investment by Elliott Respondents, and available capital that Westmont, directly or indirectly, intended to rely upon in order to purchase the shares of CVH.

Petitioners also seek deposition testimony, though the people with knowledge are located in France and England. (Pet'r's Br. 25.) They admit that they currently are unable to bring a fraud claim against Westmont in the UK because they lack information concerning Westmont's state of mind. (ECF No. 15, Levy Decl. ¶¶ 12, 38.) They contend that the requested documents and information will shed light on Westmont's state of mind and/or intent and fill-in the information they need to initiate suit in the UK.

Both sets of Respondents object to the Petition. For their part, the A&M Respondents state that an indirect affiliate located in France provided diligence services and possesses the documents and information sought—not the A&M Respondents in this action. (A&M Resp't's Br.

7

12.) The French A&M entity is wholly owned by a U.K. affiliate of the A&M Respondents, and neither the French nor the U.K. entities maintain offices in the United States. (*Id.*) In other words, Petitioners are going after the wrong A&M entities in the wrong place and thus they cannot be "found" in this District. (ECF No. 31, Martinez Decl. ¶¶ 4-5).

The Elliott Respondents similarly state that a related entity based in the UK not named in this action was directly involved with Westmont and that Respondents are the incorrect target for discovery and thus cannot be "found" in this district. (Elliott Resp't's Br. 15.) They argue that Petitioners cannot show that the information sought is actually for use in a foreign proceeding because they threatened suit two years ago but still haven't brought suit and admit that they do not have sufficient facts to bring a claim against Westmont. (*Id.* at 15-16.)

Both sets of Respondents characterize Petitioners' application as a fishing expedition and contend that even if the statutory factors for obtaining discovery are met, the Court should exercise its discretion and deny the discovery.

**LEGAL STANDARD**

Section 1782 empowers a United States district court to order any person residing within its jurisdiction to provide discovery for use in a foreign proceeding pursuant to the application of an interested party. 28 U.S.C. § 1782(a). Applicants for discovery under Section 1782 must meet three statutory requirements: "(1) the person from whom discovery is sought must reside or be found in the district in which the application was made, (2) the discovery must be 'for use in a foreign proceeding before a foreign tribunal', and (3) the applicant must be either a foreign tribunal or an 'interested person.'" *In re Accent Delight Int'l Ltd.*, 869 F.3d

8

121, 128 (2d Cir. 2017) (citing *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, LLP*, 798 F.3d 113, 117 (2d Cir. 2015)).

Provided the statutory requirements for discovery are met, the Court must then determine, in its discretion, whether the discovery should be permitted in light of the four so-called *Intel* factors. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). These factors are as follows:

- Whether the person from whom discovery is sought is a participant in the foreign proceeding;
- The nature and character of the foreign tribunal and proceedings before it, as well as the tribunal's receptivity to U.S. federal-court judicial assistance;
- Whether the discovery requested is an attempt to circumvent foreign proof-gathering restrictions or policies of a foreign country or the United States; and
- Whether the discovery is unduly intrusive or burdensome.

*Intel*, 542 U.S. at 264-65. When evaluating these factors, the Court must be mindful of the goals of Section 1782: to provide efficient means of assistance to participants in international litigation and to encourage foreign countries by example to provide similar means of assistance to U.S. courts. *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97 (2d Cir. 2020). Finally, "[t]he *Intel* factors are not to be applied mechanically," and instead, "[a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018).

## ANALYSIS

Only the first and second statutory elements of Section 1782 are at issue, while all four of the *Intel* factors are disputed. The Court addresses only the statutory elements, as they are dispositive.

9

### 1. Whether Respondents "reside" in this District

Both sets of Respondents concede that they reside in this District. However, both contend that the true target of the discovery is a foreign-based affiliate and that Petitioners are therefore improperly targeting them merely to satisfy this element of Section 1782. The A&M Respondents say A&M France or its parent, A&M Europe Holdings, are the entities that were involved and/or that might reasonably have relevant documents. The Elliott Respondents contend Elliott UK is the entity that was involved and/or that might reasonably have relevant documents.

In *In re del Valle Ruiz*, the Second Circuit addressed the contours of this element of Section 1782. 939 F.3d 520 (2d Cir. 2019). It held that the statute's reach extends "to the limits of personal jurisdiction consistent with due process." *Id*. at 523; see also *In re Edelman*, 295 F.3d 171, 178-79 (2d Cir. 2002) (endorsing "flexible reading" of the statute's "resides or is found" language). It also held that the statute may be used to reach documents located outside of the United States, but that such discovery is within the discretion of the district court. *In re del Valle Ruiz*, 939 F.3d at 524. In so finding, it upheld the district court's grant of Section 1782 discovery from a New York-based affiliate of Spain-based Santander Bank for certain documents located in Spain. It stated, however, that "a court may properly, and in fact should, consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery." *Id*. at 533.

Respondents urge the Court to follow *Fuhr v. Deutsche Bank,* 2014 WL 11460502 (S.D.N.Y. Aug. 6, 2014), *aff'd* 615 F. App'x 699, 700 (2d Cir. 2015), to find that Petitioners do not satisfy the first statutory element of Section 1782. In *Fuhr*, the Court upheld denial of a Section

10

1782 petition when the true target of the petition was Deutsche Bank (Suisse) in Geneva, Switzerland, not Deutsche Bank AG, and the relevant documents were all located in Switzerland, not the Southern District of New York. The Court found that even if Deutsche Bank AG were "found" in this District, the court did not abuse its discretion in denying the petition when there was no evidence that any information was located within this District. However, reliance on *Fuhr* is not appropriate insofar as it is a summary order without precedential effect and given the Circuit's later holding that extraterritorial discovery is permitted and endorsement of a flexible reading of the statute's first element.

Insofar as Respondents all concede they themselves can be found in this District, the first statutory element is met.

### 2. Whether the Information Sought is "for use" in a Foreign Proceeding Before a Foreign Tribunal

Next, Respondents contend that the second statutory element is not met because Petitioners (1) concede they do not currently have sufficient evidence to bring a claim against Westmont in England because they lack evidence on state of mind and (2) have been threatening suit against Westmont for two years but still have not brought suit and that the delay suggests an empty threat.

The U.S. Supreme Court in *Intel* expressly stated Section 1782 "requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation." 542 U.S. at 247; see also *In re Sargeant*, 278 F. Supp.3d 814, 823 (S.D.N.Y. 2017) ("Courts must guard against the specter that parties may use § 1782 to investigate whether litigation is possible before launching it"); *Jiangsu Steamship Co. v. Success Superior Ltd.*, 2015 WL 3439220, at *6 (S.D.N.Y. Feb. 5, 2015) ("The only thing that the contemplated §

11

1782 discovery would assuredly be 'in aid' of is [applicant's] decision-making, and the statute is not designed to provide potential litigants with information that will help them decide whether and where to commence proceedings."); *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 707 (S.D.N.Y. 2015) (petitioner's burden on this statutory factor "is not satisfied because the petitioner has retained counsel and is discussing the possibility of initiating litigation"); cf. *Mees v. Buiter*, 793 F.3d 291, 300, n.13 (2d Cir. 2015) (finding discovery under § 1782 is not limited to what is necessary to commence suit).

In *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 100-101 (2d Cir. 2020), the Second Circuit stated that a future proceeding that is "merely speculative" does not satisfy the second element of Section 1782.  In that case, the Court found the district court erred in finding that the petitioner satisfied the element for a possible claim to be filed in Spain where the petitioner stated he planned to use the discovery to prove that certain individuals had provided false testimony in another proceeding.  The petitioner did not provide the legal theory supporting his planned criminal action, lay out the content of his claims or provide a factual basis for his belief that the witnesses gave false testimony. *Id*. at 101.  Additionally, he did not provide a time frame within which he would bring the planned proceeding.  This was because his future action depended on the evidence obtained through the petition. *Id*.

In this case, Petitioners concede they currently do not have sufficient information to bring a suit against Westmont.  They also do not provide the factual basis for their theory that Westmont fraudulently led them on and sought extensions solely to extract price concessions as opposed to the far more plausible explanation for slowing down the deal and backing out due to the looming COVID pandemic that evolved rapidly in January-February 2020.  Although

12

they characterize concerns raised in due diligence as frivolous, the factual basis for fraudulent intent is lacking. Petitioners do not state with any specificity the information they expect Respondents to have in their possession that would reflect fraudulent intent. During oral argument, upon probing, it became clear to this Court that Petitioners are merely speculating that Westmont did not have real due diligence concerns and other negotiating points to string out the negotiations to extract a lower price. Petitioners' broad demands reveal the discovery sought is more in the nature of a fishing expedition with the hope that it will turn up sufficient factual information to support a colorable claim of fraud.

Petitioner's cases are all distinguishable on this point. *In re Kuwait Ports Auth.*, 2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) (action permitted under Cayman law when fraud is merely suspected and facts established that fund needed to be wound up in accordance with Cayman law; petitioner not relying on requested discovery to assess whether to initiate winding up proceeding); *In re Top Matrix Holdings Ltd.*, 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) (no indication that petitioner could not plead underlying claims absent the requested discovery); *In re Furstenberg Finance SAS*, 2018 WL 3392882 (S.D.N.Y. July 12, 2018) (same); *Union Fenosa Gas, S.A. v. Depository Trust Company*, 2020 WL 2793055 (S.D.N.Y. May 29, 2020) (underlying proceeding already ongoing). In sum, the Court has strong suspicions that the petition is a pre-suit fishing expedition and that the planned action is speculative at the current time.

The Court notes that nearly two years have passed since the suit was first threatened. This passage of time also suggests that the suit is not reasonably contemplated. *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.* (the "*Certain Funds* case"), 798 F.3d 113 (2d Cir. 2015) (passage of five years from events on which planned action premised rendered

13

action not within "reasonable contemplation" for purposes of the second element of Section 1782).

Finally, while it is true that the federal court in Texas stated that the lawsuit against Westmont was reasonably contemplated when declining petitioners' Section 1782 petition for pre-suit discovery against Westmont, that petition was filed in 2020.  *Banoka*, 2022 WL 480118, *2. Two years have passed since then.  There is no reason the Petitioners could not have pursued discovery in New York at the same time or conducted further investigation during the past two years.  That they did not shore up their planned claim against Westmont and did not resort to an action in English courts to pursue pre-action disclosure by Westmont (which they could have done) only underscores why this Court is suspicious that this action is a fishing expedition.[3]  *Id*.  The Texas court's decision is not dispositive because it concerned different respondents, was decided much closer in time to the events underlying the planned action, and even that court expressed some skepticism at the planned action, noting that it was "speculative."  *Banoka*, 2022 WL 480118, at *5.

Accordingly, Petitioners do not satisfy all of the statutory prerequisites for obtaining discovery pursuant to Section 1782 because the discovery sought is not for use in a contemplated action and is in the nature of a fishing expedition.

---

[3] Petitioners are not obliged to first seek discovery in the U.K. before seeking discovery from Respondents and there is no evidence that a U.K. court would reject evidence obtained through this action.  *Mees*, 793 F.3d at 303, n.20.  Nevertheless, a Court may "consider[ ] … foreign discoverability (along with many other factors) when it might otherwise be relevant to the § 1782 application." *Mees*, 793 F.3d at 303.  Here, Petitioners were denied discovery from the named target of the alleged fraud and did not seek discovery from the target in the U.K. or from the affiliates of Respondents who were directly involved with the negotiations at issue.  Nor have they identified specific documents or witnesses located in the United States.  Rather, it appears that all documents and witnesses are located outside the United States and these Respondents are targeted solely because of their presence in the United States, not because of their direct involvement in or knowledge of the transaction at issue.

## CONCLUSION

For the reasons set forth above, Petitioners' motion for discovery is DENIED as to both Respondents.

**The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 12.**

Dated: February 1, 2023
New York, New York

So ordered,

*Katharine H Parker*

KATHARINE H. PARKER
United States Magistrate Judge